Filed 5/20/26  In re J.C. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re J.C., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH & HUMAN SERVICES AGENCY, | D086974 |
| Plaintiff and Respondent, | (Super. Ct. No. J521624) |
| v. | |
| T.C., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Daniela Reali-Ferrari, Judge.  Affirmed.

Megan Turkat Schirn for Defendant and Appellant.

Damon M. Brown, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, Katie Abajian, Deputy County Counsel, for Plaintiff and Respondent.

By the time J.C. turned two years old, he was exposed to over 10 violent confrontations between his parents, including an incident where T.C. (Father) strangled G.P. (Mother). Father appeals from the juvenile court's visitation order made at a contested disposition hearing. He solely contends the juvenile court abused its discretion when it limited him to supervised visits with J.C. because he claims there was no evidence J.C. was at risk of harm in his care. We disagree and affirm the order.

I.      FACTUAL AND PROCEDURAL BACKGROUND

A.      *The Agency's Petition*

The San Diego County Health and Human Services Agency (Agency) received police reports in February and May 2025 indicating J.C. had witnessed violent incidents, including Father yelling, throwing and breaking items, and strangling Mother. The police received 12 domestic violence calls for the parents in 10 months. The Agency also received calls concerning domestic violence in the family home. Many of the reports involved Father being under the influence of alcohol.

The Agency interviewed the maternal grandmother, who lived with the parents for several months. She said there was an incident every weekend because Father would drink, come home, and argue or fight. She described Father as violent and aggressive. She said he screams, throws things, and makes holes in the walls while J.C. is home.

The Agency also interviewed Mother's friend and sister. The Mother's friend reported seeing Mother with a black eye and bruises. The Mother's sister said J.C. witnesses all the violent incidents in the home, including many times when Father tried to strangle Mother. The sister also said Father tried to run Mother over with a vehicle. Mother once casually told her sister, "Oh, he threw a can at my face."

The Agency educated the parents about the risk to J.C. and tried to create a safety plan with them. Still, the parents wanted to keep the family together and disagreed with the statement that J.C. was in danger. It became apparent that the parents were unwilling to agree to any action steps to achieve a sufficient level of safety for J.C.

Consequently, the Agency filed a petition pursuant to Welfare and Institutions Code[1] section 300, subdivision (b), alleging J.C. was at a substantial risk of serious physical harm due to his exposure to violent confrontations between his parents at home. It further alleged J.C.'s parents were engaged in a pattern of domestic violence and they continued to minimize its negative impact on J.C.

The Agency also requested a protective custody warrant to detain J.C. in a resource family home. The juvenile court granted the Agency's request. After J.C. was detained out of the parents' care, the parents became motivated to create a safety plan so J.C. could return to Mother's care in the family home. Maternal grandmother and grandfather agreed to alternate residing in the home to provide additional safety, and Father agreed to move out.

At the detention hearing, the juvenile court made a prima facie finding on the petition that J.C. is a child described by section 300, subdivision (b), issued a temporary restraining order protecting Mother from Father, and ordered the Agency to detain J.C. with Mother on the condition that the maternal grandmother resides in the home.

---

[1] All statutory references are to the Welfare and Institutions Code.

3

B.    *Jurisdiction and Disposition*

Initially, Father moved to Arizona to live with his mother.  He visited J.C. through video calls and once traveled to San Diego for a supervised in-person visit.  Father later moved back to San Diego and had another supervised visit with no concerns.  Father also took some parenting classes and began attending therapy.

The Agency remained concerned, however, because Father said he was creating a safety plan with his therapist saying he was a victim of domestic violence.  And when the social worker spoke with Father about the time he strangled Mother, he denied it was strangulation and said he pushed Mother by the neck, squeezing her neck only to guide her to the couch.  Further, Father continued to claim J.C. was sleeping during all the incidents and denied J.C. was affected by the violence.

The social worker's report stated that Father had neither participated in domestic violence treatment nor gained insight into the domestic violence that exists in his relationship with Mother.  The Agency recommended that someone other than Mother should supervise Father's visits with J.C.  The Agency did not recommend placement with Father because he was the offender in the relationship, and the Agency was concerned about his sobriety.  As a result, the Agency opined there is a substantial risk J.C. will suffer serious physical harm if J.C. were to return to Father's care.

At the contested adjudication and disposition hearing, the juvenile court sustained the petition, finding the allegations true by a preponderance of the evidence.  The court declared J.C. a dependent of the juvenile court and found that conditions still exist that justify the assumption of jurisdiction under section 300 or are likely to exist if supervision is withdrawn.  The court explained that the parents had not mitigated the protective issues, and "the

4

court is very concerned about the Mother's lack of insight about the detriment that the domestic violence causes this very young child." The court placed J.C. in Mother's care, explaining the only reason for not ordering removal from Mother is the fact maternal grandmother is living in the family home and is willing to take protective measures. The court ordered Father to stay away from Mother. The court also ordered liberal supervised visitation for Father, and it vested the Agency with discretion to modify visitation to unsupervised status and to begin overnight visits for Father with 72 hours' prior notice to J.C.'s counsel. Further, the court ordered Mother not to supervise Father's visits.

## II. DISCUSSION

The only issue on appeal is whether the juvenile court abused its discretion in restricting Father's visitation to supervised. We conclude it did not.

"The power to regulate visits between dependent children and their parents rests with the juvenile court." (*In re D.P.* (2020) 44 Cal.App.5th 1058, 1070.) "The court may, of course, impose any . . . conditions or requirements to . . . define the right to visitation in light of the particular circumstances of the case before it." (*In re Jennifer G.* (1990) 221 Cal.App.3d 752, 757.) When the court defines the right to visitation, it balances "the interests of the parent in visitation with the best interests of the child." (*Ibid.*) "[I]ts visitation orders will not be disturbed on appeal absent an abuse of discretion." (*In re D.P.*, at p. 1070.) "A court abuses its discretion 'if its determination is arbitrary, capricious or patently absurd.' " (*In re A.F.* (2024) 102 Cal.App.5th 778, 786.)

Father contends restricting his visitation was unnecessary to protect J.C. We disagree.

5

Father fails to acknowledge the substantial evidence supporting the juvenile court's implicit determination that unsupervised visits would place J.C. at a substantial risk of harm, even with a court order for Father to stay away from Mother. Mother said Father usually drinks on the weekend and "takes a lot of shots" or he will drink a 12-pack of beer and two shots in a day. She observed that alcohol causes him to become angry and get upset about the past. She also said Father abused alcohol in his prior marriage.

The maternal grandmother, who lived with the parents for five months, reported Father had a pattern of coming home drunk on the weekend. On one occasion, the police responded to the home because Father was drunk and throwing objects. On another occasion, Father explained to the police he drank so much alcohol he stumbled onto a television in the home, causing it to fall and break. A police detective shared concerns about the parents' alcohol use because many of the incidents were triggered by alcohol.

The Agency did not recommend placement with Father in part because of Father's alcohol abuse. Based on Father's behavior while he is intoxicated around J.C., the juvenile court could reasonably determine that J.C.'s safety is at risk when he is with Father.

Father contends he was the primary caregiver for J.C. and there were no reported concerns with his ability to parent his child. But there are many reported concerns with his ability to parent J.C. during the periods of time he is intoxicated, pushing, hitting, kicking, throwing, and breaking objects, and making holes in the walls instead of providing his child with a safe and peaceful home.

Notably, Father placed J.C. in the middle of a stressful and dangerous incident when Father came home intoxicated and attempted to leave with J.C. The police report showed Mother followed Father, got into the car, and

6

begged him not to leave with J.C., and Father admittedly pushed Mother out of the car. As a result, Father was arrested.

In another police report, Mother said Father was drunk and threw objects. Later, Mother asked Father to go to the backroom so she could watch television with J.C. in the living room. After Father went to the backroom, Mother heard Father banging and throwing things, and J.C. began to cry.

Perhaps the most troubling evidence concerned Father grabbing and strangling Mother, leaving redness to her neck, scratches on her body, and a bruise on her left arm, all while then one-year-old J.C. was in the home.

In addition to the risk of physical injury, the social worker reported that long-term exposure to incidents like these may increase J.C.'s stress levels and negatively impact his brain development. He also may become hyper-vigilant to his surroundings and develop posttraumatic stress disorder and other psychological problems.

While there is evidence Father began parenting classes and therapy and had some in-person supervised visits without any concerns, the social worker's report showed Father did not gain insight into the protective issues. Despite Father being a domestic violence abuser, he claims to be a victim of domestic violence. Father did not start domestic violence treatment and denied his violence negatively affected J.C. Accordingly, the juvenile court reasonably determined Father had not mitigated the protective issues that endanger J.C.

Father contends "[i]n restricting [F]ather's visits to supervised without issuing an order of removal, the juvenile court abused its discretion as there was no showing this restriction was needed to protect the child."[2]

---

[2]    The Agency contends the juvenile court implicitly removed J.C. from

The absence of an express order of removal does not negate the substantial evidence in the record showing the restriction on Father's visitation was reasonably necessary to protect J.C.  The juvenile court explained in its oral pronouncement the disposition orders "appear very strict, and I can see the reaction of [Father] not being in agreement with the court and I understand that.  But [these] are orders that this court must make to protect your child at this time."  "I understand that your wishes are for your family to be together, but at this time this court's duty is to ensure that your child is safe."

The juvenile court's restriction on Father's visitation was neither arbitrary, capricious, nor patently absurd.

III.    DISPOSITION

The visitation order is affirmed.


McCONNELL, P. J.

WE CONCUR:


KELETY, J.


CASTILLO, J.

---

Father's custody.  Father clarified he did not raise the issue of removal on appeal.  Accordingly, this opinion does not discuss the issue of removal.

8